### CARROLL v. MELVILLE SHOE CORPORATION.

(Circuit Court of Appeals, Second Circuit. February 23, 1921.)

No. 92.

Sales ⬅1(4)—Blanket orders for manufacture of shoes held contracts when accepted.

Blanket orders for shoes, to be filled several months, later given by a dealer to a manufacturer and accepted, which specified the styles of shoes and the kind of leather, number of pairs, and price of each style, held to constitute binding contracts, though the sizes and widths were left to be specified later, in accordance with the custom of the trade.

In Error to the District Court of the United States for the Southern District of New York.

Action by Robert D. V. Carroll, trustee in bankruptcy of the Macdonald & Kiley Company, against the Melville Shoe Corporation. Judgment for defendant, and plaintiff brings error. Affirmed.

This is an action brought by the trustee in bankruptcy of the Macdonald & Kiley Company, a corporation organized under the laws of West Virginia, and having a place of business in the city of Cincinnati, in the state of Ohio. The defendant is a corporation existing under the laws of the state of New York and having its principal office in the Southern district of New York. The complaint alleges that between June 1. 1916, and November 1 of the same

year, the Macdonald & Kiley Company sold and delivered to the defendant shoes of the reasonable value and agreed price of $38,143.61; that no part thereof has been paid except the sum of $29,555.24, and that there remains due and owing a balance of $8,588.37. It is also alleged that on October 10, 1916, the Macdonald & Kiley Company was adjudged bankrupt, and that on November 6, 1916, the complainant was appointed trustee in bankruptcy of the said bankrupt, and that he duly qualified and entered upon the performance of his duties in which he is still engaged. He demands judgment against the defendant in the sum of $8,588.37.

The answer sets up, by way of set-off and counterclaim, that the Macdonald & Kiley Company agreed to sell to defendant, and defendant agreed to buy from that company, certain shoes, to wit, 16,660 pairs of shoes at $3.50 per pair, 8020 pairs of shoes at $4 per pair, and 3,000 pairs of shoes at $4.50 per pair; that the vendor promised to deliver all of the said shoes to defendant on or prior to February 1, 1917; that on or prior to October 30, 1916, the company, in part performance of its agreement, duly delivered to defendant 10,795 pairs of shoes at the agreed price of $3.50 each, 2,441 pairs at the agreed price of $4 each, 300 pairs of shoes at the agreed price of $4.50 each, and no more. The answer also states that the defendant was at all times ready and willing to accept and receive the residue of the said shoes, which the company, however, neglected and refused to sell and deliver. It alleges that by reason of the premises the defendant has been damaged in the sum of $10,000, which amount it seeks to set off or counterclaim against the sum which may be found unpaid in respect of shoes heretofore delivered by the company to the defendant.

The plaintiff thereupon filed a reply in which it admitted that prior to October 30, 1915, the company had delivered to the defendant 1,566 pairs of shoes at the agreed price of $3.35 per pair, 7,927 pairs at the agreed price of $3.50 per pair, 2 pairs of shoes at the agreed price of $3.75 per pair, 3,831 pairs of shoes at the agreed price of $4 per pair, 1 pair of shoes at the agreed price of $4.25, 326 pairs of shoes at the agreed price of $4.50, 3 pairs of shoes at the agreed price of $4.75 per pair, 16 pairs of shoes at the agreed price of $5 per pair, and 1 pair of shoes at the agreed price of $5.25 per pair.

At the close of the case both sides moved for the direction of a verdict. The court after having taken the case under advisement directed a verdict for plaintiff for $5,803.27. Judgment was entered in favor of the plaintiff in that amount on August 1, 1919. Thereafter the defendant moved to vacate the judgment and for a new trial. The court took that motion under advisement and filed an opinion that the defendant's damages exceeded in amount the total of the plaintiff's claim, and that judgment should be vacated and directed a verdict for defendant. An order was entered on December 10, 1919, vacating the previous judgment, and on December 13, 1919, a judgment was entered in favor of defendant upon its counterclaim against the plaintiff to the amount of the plaintiff's demand. This judgment was vacated on May 11, 1920, and a new judgment in favor of defendant was entered on the same day.

Cadwalader, Wickersham & Taft, of New York City (Walbridge S. Taft, of New York City, of counsel), for plaintiff in error.

Hastings & Gleason, of New York City (A. H. Gleason, of New York City, of counsel), for defendant in error.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is an action to recover the value of shoes sold and delivered, amounting to the sum of $8,588.37. The defendant admits such sale. The difference between the parties arises as to the defendant's counterclaim. The theory of the defendant is that the Macdonald & Kiley Company contracted to deliver an additional number of shoes and then failed to

make delivery of them in accordance with its agreement. It is necessary, therefore, to determine whether there was any such contract as the defendant asserts. The defendant corporation is not engaged in the manufacture of shoes, but conducts some 15 retail shoe stores. It was necessary to notify the shoe manufacturers in advance of what the retailers would need, so as to give the factories the time needed to manufacture them. The defendant usually ordered its fall goods in March and April and its spring goods were ordered in the summer. The president of the defendant corporation testified as follows:

"Q. When you give orders can you give the exact sizes you want? A. No; we don't do that; we do it in blank. We give the quantity of a certain grade of shoes to a manufacturer, and he covers, and that is then detailed at different intervals after that.

"Q. When you say detailed, what does that mean? A. Write out the sizes and the detailed description of the shoe.

"Q. In other words, if a man has an order for 10,000 shoes of a certain number, the material, no matter what the size, is identical, is it? A. Yes, sir. We buy 10,000 pairs of shoes No. 13, Russian, of a certain grade of shoe to be delivered, for instance, between the 1st of July and the 1st of November. We will detail within two weeks a portion of that order, maybe 15 or 20 per cent., and two weeks after another 15 per cent.

"Q. You mean you give the sizes? A. Yes, sir.

"Q. The number of the particular sizes? A. Yes, sir; the tip punch and different other little details of the shoe.

"Q. That is what you mean by details? A. Yes, sir.

"The Court: In your first order you did not give either the sizes or the details?

"The Witness: No, sir.

"The Court: But merely the number of shoes?

"The Witness: The object of the first order is for the manufacturer to cover himself with leather that goes into that shoe."

At the time herein involved the defendant did not deal in either women's or children's shoes, but only in men's shoes.

The Macdonald & Kiley Company on March 28, 1916, wrote to the defendant a long letter, in which it explained the reasons why in the existing condition of the market, and because leather at the time was "continuing to soar higher and higher every week," it was important that orders should be placed with them early. The letter informed defendant that a great many merchants recognizing conditions had placed orders in March which heretofore had not been placed until May or June. The writer added:

"I wish to be in a position to know the exact number of shoes you would wish for next fall, so as to prepare and set aside for your individual business all materials including upper leathers, mat calf, linings, facings, sole leathers, innersoles, welting, heel stock, etc., which I purchased at the old prices, so as to be able to give you your regular line of shoes at the same price as formerly and allow you to sell them at the prices you have been selling this grade of merchandise."

The letter also stated:

" * * * We will in no way embarrass you on your size-up orders, without giving you plenty of time to adjust yourselves to the new conditions arising."

This led to what is called the first blanket order sent to the Macdonald & Kiley Company. It is dated April 14, 1916. It stated that:

"Below is a list of shoes which we will buy of you for delivery from August 1, 1916, to November 15, 1916. The sizes will be detailed as far in advance as we feel safe in detailing them. These shoes should be the same quality as we are now receiving from you at $3.50 and $4 per pair. Please acknowledge this blanket order by return mail, as we are anxious to cover on shoes and to know positively that we are protected. We will need tan and black in a higher grade to sell at $6."

This followed:

|  | Stock No. | Price. | Pairs. |
|---|---|---|---|
|  | 101 | $3.50 | 600 |
|  | 102 | " | 400 |
| (Patent) | 104 | " | 300 |
|  | 107 | " | 890 |
|  | 109 | " | 270 |
|  |  |  | 2460 |

|  | Stock No. | Price. | Pairs. |
|---|---|---|---|
|  | 151 | $3.50 | 800 |
|  | 154 | " | 1350 |
| (Gunmetal) | 155 | " | 550 |
|  | 158 | " | 600 |
|  | 172 | " | 150 |
|  | 176 | " | 550 |
|  |  |  | 4000 |

|  | Stock No. | Price. | Pairs. |
|---|---|---|---|
| (Pat. calf Mat top) | 0103 | $4.00 | 220 |
|  | 124 | $3.50 | 1200 |
|  | 138 | " | 400 |
|  | 146 | " | 500 |
|  | 122 | " | 1000 |
|  |  |  | 3100 |

|  |  |  |  |  |
|---|---|---|---|---|
|  | 0108 | $4.00 | 150 |  |
| (Buck top) | 0109 | " | 300 |  |
|  | 0132 | " | 150 |  |
|  | 0143 | " | 150 | Patent |
|  | 0153 | " | 250 | Tan |
|  | 0162 | " | 300 | Gunmetal |
|  |  |  | 1300 |  |

The second blanket order is like the first. It is dated April 26, 1916. It begins:

"Please add to the blanket order sent you April 14th the following number."

The third blanket order is like the first. It is undated and begins:

"Please add to the blanket order sent you April 14th the following numbers: * * *"

None of these blanket orders contained any reference to sizes, as the first of the orders specifically stated. They indicated, however, the price, the number of pairs, and the stock. The omission of the size and

width is explained by the statement in the letter sent the defendant asking for the orders, and which we have already quoted that the manufacturer would "in no way embarrass you on your size-up orders."

Before the Macdonald & Kiley Company wrote its letter of March 28th soliciting orders its president in February had a conversation in New York City with representatives of the defendant. The president testified that at that time it was agreed that the defendant would want "roughly" 40,000 pairs of shoes and would get at the orders very short-ly. The court asked him whether he meant final orders, and the witness replied: "His final orders to me for the following fall's business." He also testified that after he returned from New York he addressed the letter dated March 28th to defendant, "because we were very anxiously waiting for those orders that had been promised to be sent to us a long while before." This must refer to "the final orders" to which he had previously referred. He also testified that the letter written by defendant on April 14th, and referred to above as the first blanket order, was probably the answer to his letter of March 28th.

The following excerpt from the testimony of the president of the Macdonald & Kiley Company concerning the first of the blanket orders is instructive. It is as follows:

"Q. Mr. Graydon in regard to this we will say Defendant's Exhibit B one item if you will take it, stock No. 101, 600 pairs; from that you knew how much stock to order to take care of that, wouldn't you? A. Yes, we would know how much stock practically.

"Q. I mean in a general way. A. Yes.

"Q. And that would be true, without my going through the whole lot of each stock number, would it not? A. Of the stock number, that is true in regard to stock.

"Q. You would not need, of course, the sizes, would you? A. No.

"Q. You have to purchase leather in order to meet your future demands especially on a rising market, don't you? A. That is the policy.

"Q. I mean it is good business policy to do so? A. Yes.

"Q. And I believe that you indicated that good business policy in regard to the leather you purchased? A. Yes.

"Q. And therefore you desire to know in the spring about how much stock you would use, don't you? A. We always calculate, about.

"Q. If it is a rising market especially? A. Yes.

"Q. And in the spring of 1916 it was a rising market, was it not? A. Yes.

"Q. I refer now to stock No. 101, price $3.50, 600 pairs. If a week or ten days or two weeks or a month after that you received an order to make 100 pairs of 6's, 200 pairs of 7's, 200 pairs of 8's, and 100 pairs of 9's, and the widths were given, you could go on with the order from that detail, couldn't you? A. We could go on with the order, because we had Mr. Melville's lot number, lot 101. We had the style of the shoe in our firm.

"Q. So all you needed then was the size, the number of sizes and the width, was it, to complete? A. You had to have your sizes and width.

"Q. And that was true of all the stock numbers here, was it not, on these exhibits? A. As regards the stock numbers on these exhibits, I in my business never even looked at them, because I was only figuring on the stock. They didn't mean anything to me.

"Q. With stock No. 101 and 102, you knew what that was. A. I knew the style of the shoe.

"Q. And all you needed to make up was the number of sizes and the width? A. Yes; and the order to make it."

The stock number in the blanket order described the shoe, the style, and trim, and height of heel. Unless these "blanket orders" were in

fact *orders* they could not have been of value to the Macdonald & Kiley Company in helping them determine the amount and various kinds of leather needed. But there is nothing in the testimony showing that they were ever objected to, after their receipt, as being ambiguous or indefinite or in any way unsatisfactory. In a letter dated June 29th, and which evidently relates to the blanket order of April 24th, above printed, the Macdonald & Kiley Company wrote the defendant as follows:

"An item, which I wish to call to your attention, is in regard to the Tan Calf shoe, and that is to the effect that the tan calf shoe at $3.50 per pair is a very difficult proposition for us, as the cutting figures in this shoe are way above cost for the shoe at $3.50. This refers only to the $3.50 shoe in the tan leather. We have plenty of stock to cover the $4 shoe, which is the No. 33, or darker shade of leather. We hope you can see your way clear to give us as many shoes as possible in the $4 grades, as a tan shoe at $3.50 is rather disastrous to us. *Where it is possible we hope you can cut this order* down in the $3.50 shoe in the tan leather, and put same in the $4 grade, as we realize you would not wish us to go too far in making a shoe at an actual loss."

An order may be either an offer or an acceptance. The blanket orders given in this case appear to have been offers. The evidence in the record discloses that these offers were accepted by the Macdonald & Kiley Company, to which they were made. On April 19th, acknowledging receipt of the first of the blanket orders, the company wrote, referring to the gun metal, patent, tan calf, and patent calf shoes:

"We beg to state we have material on hand to take care of these entire orders at the present time."

Then they added:

"In case there is any difficulty in regard to getting the particular shade of buck top that you desire, we will get into communication with you and have you use your influence with the Richard Young Company."

On April 28th the company acknowledged receipt of the second blanket order, writing:

"We have your specifications of April 26th and are adding same to your blanket order of April 14th. We beg to state in regard to the material, to cover these specifications, we are in excellent shape. * * * With regard to the buck situation for the tops of shoes, we can say it is clearing up very nicely. Monday morning we will receive enough buck material to take care of your last orders. * * * From the above you can see the situation in regard to this material will meet all of your requirements."

On May 29th, concededly after all three blanket orders were given, the company asked for a readjustment of the selling price of the Cordovans. If it had not considered that it had accepted the orders, it would have been unnecessary to plead for a *readjustment* of the selling price. In a letter dated June 21st, the company wrote, acquiescing in the defendant's request that its order for 5,000 pairs of Cordovans should be reduced to 2,000 pairs, and added:

"You must recognize the fact that we carried out all of our obligations in this regard and covered on enough material to take care of your entire order."

There are other statements in the correspondence which it is not necessary to set out in detail which convinces us that the offers made by the defendant were accepted, and that it was the understanding of both parties that a binding contract existed between them. This was not a unilateral, but a bilateral, agreement. It cannot be supposed that if, after the company, in reliance upon these blanket orders, had laid in the required stock, the price of leather had materially declined, and defendant had repudiated the orders, the company could not have recovered for any damages it suffered by such a repudiation.

It is true that in the letters which the Macdonald & Kiley Company addressed to the defendant the term "order" is sometimes used, and at other times the word "specification" is employed. The counsel for the trustee in his argument in this court attached importance to the fact, and has asked the court to regard the term as meaning simply an estimate. This correspondence must be construed as a whole, and the writer of the letters has sometimes used the word "order" and sometimes "specification," evidently referring to the same thing. The first definition of "specification" given in the Century Dictionary is the following:

"An act of specifying, or making a detailed statement, or the statement so made; a definite or formal mention of particulars; as a specification of one's requirements."

Each blanket order was a specification of the number of shoes and the kind of leather they were to be made from, which the defendant would require and desired the company to furnish. Both parties referred to it as an order, and so understood and acted upon it. The Macdonald & Kiley Company had not asked for an "estimate." In the letter of March 28, 1916, already quoted, they stated that they wished "to be in a position to know the exact number of shoes" wanted, so as "to set aside for your individual business all materials" that would be needed. It was in reply to that request for the exact number that defendant sent in the orders. The defendant, in sending them, did not state that it would want approximately the number of pairs of shoes specified, or that it was estimating its needs. The orders were absolute, and it was as important for the defendant to have an absolute understanding of the matter as it was that the manufacturer should know "the exact" number. The defendant, in sending in the order, requested the company, as we have seen, to "acknowledge this blanket order by return mail, as we are anxious to cover on shoes *and to know positively that we are protected.*" And how can it be seriously contended that a statement is an "estimate," and not an "order," which begins:

"Below is a list of shoes which we will buy of you for delivery at a time and price specified."

In Croshaw v. Pritchard, 16 Times L. R. 45, a builder solicited estimates for work in connection with his construction job. The defendant submitted a detailed statement, which he headed "Estimate." The plaintiff immediately wrote, saying that his estimate was accepted. The court held the estimate was a firm order.

We do not think that the agreement made between the parties involved any such indefiniteness as invalidated it. The price to be paid was fixed. The number of pairs of shoes to be made and delivered was determined. The kind of leather to be used was agreed upon. The style of shoes was specified. The fact that the manufacturer did not know the size and the width of the various kinds of shoes it was to furnish was alone left for future determination. But it was not left open to be determined by both contracting parties. It was for the sole determination of the defendant. As long as the manufacturer knew how many pairs of patent leather shoes he was to furnish at $3.50 per pair, it was not important that he should know whether they were to be size 7 or size 8 until the defendant wanted the shoes made up, and so it was agreed that defendant should furnish that information thereafter, and far enough in advance to enable the shoes to be delivered when they were wanted. It cannot be said that this left the contract so indefinite as to be unenforceable.

In Single Paper Co. v. Hammermill Paper Co., 96 App. Div. 535, 89 N. Y. Supp. 116, the parties entered into a contract to sell and deliver 50 tons of No. 1 sulphite manilla paper upon a certain basis of weight at 3 cents per pound. The order given and accepted specified the amount and general kind and quality of paper to be furnished, the price, and the details as to shipment and delivery. By agreement it was understood that certain details were later to be furnished relating to the size and weight of the sheets. The information as to these omitted details was to be furnished subsequently at certain stipulated times. It was held that the contract was not made indefinite because the plaintiff was left to determine the details of size and weight, and that the defendant, having accepted the offer, could not cancel it; the plaintiff not being in default as to furnishing the information as to size and weight. "In our opinion," said the court, "the contract was not rendered incomplete or indefinite, in its substantial provisions and requirements, because plaintiff was left in the future to furnish these details of size and weight."

It clearly appears that the contract was breached, and that the damages sustained by the defendant exceed the plaintiff's demand.

Judgment affirmed.